```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
                              LEXINGTON
```

| | |
|---|---|
| POLLY WELLS, as executrix of the estate of John Wells, deceased, | ) ) ) Civil Action No. 5:05-183-JMH |
| Plaintiff, | ) ) ) |
| v. | ) **MEMORANDUM OPINION AND ORDER** ) |
| PORTMAN EQUIPMENT COMPANY, et al., | ) ) ) |
| Defendants. | ) |

```
                **    **    **    **    **
```

Before the Court are the summary judgment motions of Defendant, Bil-Jax, Inc., formerly d/b/a Workforce Products ("Bil-Jax") [Record No. 68] and Defendant Portman Equipment Company ("Portman") [Record No. 76]. Plaintiff Polly Wells ("Plaintiff") responded to the motions [Record Nos. 69 & 77, respectively], and Bil-Jax filed a reply [Record No. 73]. Fully briefed, this matter is ripe for review.

Portman's motion for summary judgment was filed twenty-seven days after the expiration of the dispositive motion deadline; it has asked the Court for leave to file its summary judgment motion out of time [Record No. 75].

## I. BACKGROUND

Plaintiff's decedent, John Wells, was employed by United Metals Automation and Controls ("UMAC") as an electrician. The facts surrounding Wells's incident are not in dispute. In October of 2004, Wells was using a high lift machine (the "Lift") to

install electric equipment for UMAC. Defendant Bil-Jax manufactured the Lift and sold it to Defendant Portman on February 28, 1995, who in turn sold the Lift to UMAC on October 23, 1996. Bil-Jax had equipped the Lift with stability outriggers which were supported by jack screws. The Lift was designed and manufactured with an interlock system which prevents a user from operating the lift unless all four outriggers are deployed and locked and pressure is placed on the leveling jack screws.

At the time that Wells was using the Lift, the Lift had been modified in the following ways so that it could be operated even when the outriggers were not in place: two of the jack screws that support the outriggers were broken or missing, the outrigger placement indicator lights had been removed and replaced with a building electrical junction box, and the micro switches on the outrigger legs had been bypassed and rewired to disable the safety interlock system.[1] Wells was using the Lift without all four outriggers in place. In order to use an electric drill while using the Lift, Wells had tied the drill's extension cord to the side of the Lift. When Wells elevated the Lift, the cord became caught in a slot, was stretched and stripped down to the bare wire, and energized the Lift. Tragically, once Wells reached the electrical

---

[1] Plaintiff does not challenge Bil-Jax's and Portman's conclusion that the modifications were made after the Lift left Bil-Jax's and Portman's possession.
Furthermore, Plaintiff does not dispute that Wells used a battery charger from his personal vehicle to operate the Lift.

equipment at the building's roof, he completed the circuit, was electrocuted, and sustained fatal injuries.

The slot where the electric drill's cord had been stripped was meant to be used to lock one of the four outriggers in place. Bil-Jax argues that if the Lift had been used with all four outriggers in place, instead of being modified to work without all outriggers in place, the slot in question would have been completely blocked by an outrigger and the cord could not have been caught in the slot.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial.  *Id.* at 325.  A fact is material if its resolution will affect the outcome of the lawsuit.  *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001).  Once the moving party satisfies its burden, the burden then shifts to the nonmoving party to "come forward with some probative evidence to

support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

When determining whether there is enough evidence to overcome summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, in this case, the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). Only material factual disputes will preclude summary judgment, and the dispute must be genuine, that is, the facts must be such that if proven at trial, a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. The Court must not weigh the evidence, but must decide whether there are genuine issues for trial. *Id.* at 249.

### III.   ANALYSIS

*A.  Bil-Jax's Motion for Summary Judgment*

Plaintiff alleges that the Lift was in a dangerous and defective condition and was unreasonably dangerous to a user because it was not designed or manufactured to be as safe as reasonably possible under the state of the art of the design of such machines at the time of its manufacture. Plaintiff also asserts that Bil-Jax failed to warn Wells of the defective and inherently dangerous condition of the Lift.

Because jurisdiction in this case is based on diversity of

4

citizenship,[2] the substantive law of Kentucky applies. Quite simply, due to the modifications made to the Lift, Kentucky law bars Plaintiff's claims. KRS § 411.320(1) provides that "a manufacturer shall be liable only for the personal injury, death or property damage that would have occurred if the product had been used in its original, unaltered and unmodified condition." *Id.* Contrary to Plaintiff's assertions, KRS § 411.320(1) was neither negated nor overruled by KRS § 411.182(1). *See Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693, 703 (E.D. Ky. 2003) (relying on Kentucky cases for the proposition that the product user's mutilation or alteration of the product severs the connection between the product and the injury and precludes liability for the manufacturer); *Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 474 (Ky. 2001) (clarifying that KRS § 411.182 "repealed KRS 411.320(3), and in products liability actions, a plaintiff's own negligence with respect to the product itself is no longer a complete bar to recovery but is instead governed by the same comparative fault principles which govern the fault of any party in a tort action"); *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997) (discussing KRS § 411.300(1)-(2) and concluding that the statute codified the long-standing law of the Commonwealth that "a manufacturer is not liable when the injuries result from the

---

[2] Wells was a resident of Kentucky and both defendants, Bil-Jax and Portman, are Ohio corporations.

5

mutilation or alteration of the chattel" and that the statute "precludes imposition of liability on a manufacturer in cases where the product has not been used in its original, unaltered and unmodified condition").

Under KRS § 411.320(1), Bil-Jax is not liable when an injury results from the alteration of its lift. In this case, Plaintiff admits that Wells sustained his injuries while using a lift that was modified in several ways. Plaintiff never contends that electrical cords would have been caught in the slots even if the Lift was being used in its unmodified condition, that is, with the outriggers. Under Kentucky law, Bil-Jax is entitled to summary judgment on Plaintiff's claims against it. *See Monsanto*, 950 S.W.2d at 814.

Furthermore, Plaintiff has failed to present evidence of a design defect in the Lift. In her response to Bil-Jax's motion, Plaintiff describes the alleged design defects: (1) the Lift was designed with places where electrical cords could snag; (2) the Lift was designed with a safety device that could be easily bypassed; (3) the Lift was designed without power wired to the basket.

Kentucky law imposes strict liability on "one who sells any product in a defective condition unreasonably dangerous to the user or consumer, even though the seller has exercised all possible care in the preparation and sale of the products." *Niehoff v. Surgidev*

6

*Corp.*, 950 S.W.2d 816, 822 (Ky. 1997). "[D]efective design and failure to warn are separate aspects of the same cause of action, strict liability." *Id.* (citing KRS §§ 411.300-.350; *Dealers Transp. Co. v. Battery Distrib. Co.*, 402 S.W.2d 441 (Ky. 1965) (adopting Restatement (Second) of Torts § 402A (1965))). The determination of whether a product is defective for purposes of the strict liability doctrine involves examining whether the product creates such a risk of accident that "an ordinarily prudent company engaged in the manufacture [of the product], being fully aware of the risk, would not have put it on the market." *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980). Considerations such as "feasibility of making a safer product," "warnings and instructions," and "misuse" are examples of "factors bearing on the principal question" of whether the product is in a defective condition unreasonably dangerous to the user or consumer. *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780-81 (Ky. 1984).

KRS § 411.310(1) sets forth a statutory presumption of non-defectiveness: "In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the subject product was not defective if the injury, death or property damage occurred either more than five (5) years after the date of sale to the first consumer or more than eight (8) years after the date of manufacture." Thus, in Plaintiff's case,

7

because Wells was injured in 2004, at least eight years after the Lift was manufactured in 1995, the presumption arises that the Lift was not defective, and liability for harm caused by the Lift may not be imposed unless Plaintiff overcomes the presumption by a preponderance of evidence. *See Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924, 927 (Ky. Ct. App. 1988).

Plaintiff claims that the Lift was designed with exposed slots where electrical cords could snag. Bil-Jax counters that the slots would only be exposed, and thus able to strip an electrical cord, if the user bypassed the safety system and did not employ the outriggers. Plaintiff retorts that Bil-Jax should not have designed a product with a safety system that was so easy to bypass. Plaintiff relies on the testimony of its expert, Dr. O.J. Hahn, who opines (1) that the Lift's safety system was so simplistic that a high school student could have bypassed it and (2) that Bil-Jax should have designed the Lift with holes as opposed to slots. By punching holes instead of drilling slots, Plaintiff maintains, an electrical cord would not have been able to snag on the Lift. Plaintiff offers a third suggestion: Bil-Jax should have wired the Lift for electrical power thereby eliminating the need for users to hang electrical cords over the side of the Lift.

Plaintiff's and her expert's suggestions that Bil-Jax should have designed a Lift with (1) holes instead of slots on the outriggers, (2) a safety system that is more difficult to override,

8

and (3) electrical power are similar to testimony provided by an expert in another products liability case, *Jones v. Hutchinson Manufacturing, Inc.*, 502 S.W.2d 66 (Ky. 1973). The *Jones* court held that "'Proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or seller's duty as to the design of the product.'" *Id.* at 70-71 (quoting 63 Am. Jur.2d *Products Liability* § 73, p. 79). Plaintiff presents three different suggestions of how Bil-Jax could have designed the Lift differently as evidence that the Lift was defective. Under *Jones*, these suggestions, standing alone, that the Lift could be redesigned to improve its safety are not sufficient to establish the existence of a design defect.

As Plaintiff does not dispute that the Lift was designed so that it would not be operational unless all of the slots were covered by the outrigger legs, she does not show that the Lift's design creates the risk that electrical cords will be stripped in open slots. She has not presented evidence that the design of the lift creates such a risk that a prudent company would not have sold the lift. The Court finds that Plaintiff has not shown that there is a jury question as to a design defect on the Lift.

In her complaint, Plaintiff also relies on the theory that Bil-Jax failed to warn Wells. Responding to Bil-Jax's motion for

summary judgment, Plaintiff describes the warning that Bil-Jax failed to give: "A simple warning that electrical cords should not be tied off on the cage could have prevented this accident." Bil-Jax submits that Wells was aware of the open and obvious hazard of tying a cord to the side of a moving lift.

Plaintiff does not dispute that the Lift's operational materials and the Lift itself included warnings against using the Lift without first deploying the outriggers. Bil-Jax presents the testimony of UMAC's Kenneth Ware, who stated that Wells was trained to use outriggers and that if an employee was spotted using a lift without deploying the outriggers, the employee would have been reprimanded.

Plaintiff has not presented sufficient evidence that Wells' actions — bypassing the safety system, using a lift without the outriggers deployed, and tying an electrical cord to the side — constituted foreseeable misuse that Bil-Jax should have warned against. *See Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 521 (Ky. 1968). Plaintiff presents the testimony of UMAC employee Leonard Franklin Riddle, who stated that he has seen people operate lifts without deploying the outriggers. Plaintiff's expert Dr. Hahn testified that a high school student could bypass the safety system. That is the extent of the evidence presented to support her argument that Bil-Jax should have known that the Lift's users would bypass the system and not employ the outriggers. This

showing does not raise a genuine issue as to whether the risk of electrocution from cords being tied to lifts was a risk that Bil-Jax should have specifically warned against.

Bil-Jax expressly warned against using the machine without deploying the outriggers. By outfitting the Lift with a safety system, Bil-Jax implicitly warned against using the machine without the outriggers. Plaintiff never disputes that electrical cords could only be caught in the slots if the Lift was being used without the outriggers. As Plaintiff has not shown that the Lift was "in a defective condition unreasonably dangerous to a user," her claim against Bil-Jax does not survive summary judgment.

*B. Portman's Motion for Summary Judgment*

Plaintiff claims that Portman breached a duty owed to Wells "to deliver [the Lift] in a condition fit for the purpose intended." (Compl. ¶ 10.) Plaintiff also alleges that Portman failed to warn Wells of the defective and inherently dangerous condition of the Lift. According to Plaintiff, Portman should have recommended that UMAC purchase a lift wired for the use of power tools.

KRS § 411.340 specifically relieves retailers or "middlemen" such as Portman from liability when "(1) the manufacturer is 'identified and subject to the jurisdiction of the court;' (2) the product was sold in its 'original' condition; (3) the middleman had not 'breached an express warranty,' or (4) the middleman did not

know the product was defective." *Funk v. Wagner Mach., Inc.*, 710 S.W.2d 860, 862 (Ky. Ct. App. 1986). All of these requirements are met in the case *sub judice*. First, manufacturer Bil-Jax is obviously a defendant in this case. Second, there is no dispute among the parties that the Lift was sold in its original condition. Third, Plaintiff makes no showing that Portman breached an express warranty. Finally, Plaintiff presents no evidence that Portman knew or should have known the product was defective or "unreasonably dangerous to the user or consumer." *Id.* Portman has met its burden on summary judgment while Plaintiff has not; therefore, Portman is entitled to dismissal of the claims levied against it.[3]

## IV.  CONCLUSION

Accordingly, and for the foregoing reasons, **IT IS ORDERED**:

(1)  That Bil-Jax's motion for summary judgment [Record No. 68] be, and the same hereby is, **GRANTED**;

(2)  That Portman's motion for leave to file its summary judgment motion out of time [Record No. 75] be, and the same hereby

---

[3] Although Portman's motion was filed beyond the dispositive motion deadline, the Court finds that the motion is well made. Disallowing this motion on the basis of a late filing would result in a waste of judicial resources as a trial on the merits of Plaintiff's claim against Portman would result in a directed verdict in Portman's favor. *See Celotex*, 477 U.S. at 327 (explaining how summary judgment motions have taken the place of motions to dismiss and serve to prevent unnecessary trials and "the attendant unwarranted consumption of public and private resources").

is, **GRANTED**;

   (3)   That Portman's motion for summary judgment [Record No. 76] be, and the same hereby is, **GRANTED**.

   This the 15th day of November, 2006.



Signed By:
*Joseph M. Hood*
United States District Judge